Okay, yes, please approach, Mr. Burnett. Good morning, your honors. May it please the court, I'm Greg Burnett for appellate sheriff Ed Gonzalez. I will reserve five minutes for rebuttal. The threshold question in this case is not whether the Harris County Jail had medical care deficiencies, it is whether Sheriff Gonzalez and his individual personal capacity can be held personally liable for those systemic conditions. Counsel, I was going to sort of make that point, I appreciate you making it at the beginning, that this, as I understand it, or you tell me, this lawsuit is going forward against the county and against the health system or the health, whatever it's called. Yes, your honor, the lawsuit was originally filed against the county and the Harris Health. And an individual, what about individual officials, officers? Yes, all of, I think it's like 18 different officers, the sheriff himself also. Okay, so here we're just talking about the sheriff's personal liability? Correct, yeah. Okay. Go ahead, sir. Okay, in the case Cote v. Gogdale, this court held that municipalities, not individuals, should generally be held liable for city policies. That statement is not dicta, it reflects a structural principle embedded in the architecture of 42 U.S.C. 1983, that individual liability requires individual conduct. Respondent's appearance is flatly prohibited, supervisory liability requires either personal participation in the constitutional violation or an affirmative link, which is a deliberately chosen policy that the supervisor personally adopted that would cause a deprivation. What Duke O'Pelley's actual alleged here is that the sheriff, Gonzalez, as the county's final policymaker for jail operations, implemented policies that systemically denied detaining adequate medical care. They rely on his role as a policymaker, his authority over the county institution to create that causal chain, but that is not individual liability, that is monomial liability, using the sheriff's name as the caption in that case. Counsel, my difficulty is the district court and the appellee rely passing on the case that Edith Jones was on, C-O-L-L-E, Cole, and yet you never mention it. You wrote a four-page principle brief with no citation of multiple cases that district court relied on. So if I'm correct that in Cole we have precedent, published precedent, Edith Jones, that reversed a district court's dismissal of a detainee's claim against Sheriff Miller because of inadequate medical staffing and treatment. Okay. And you are correct. I did not adequately present that case. But that's the central case, the district court and the appellee. Is that case wrong? Yes, Your Honor, and the reason why first in Cole, Cole was reversed a 12B6 dismissal. This court held that the complaint as pleaded was sufficient to survive the dismissal and proceed to discovery. And this is a 12B6 dismissal? This is a 12B6 dismissal. But second, Cole involved a very different factual scenario than this case. Okay, but that's right again. That's 12B6. We'll wait and find out the facts. You may be right that he didn't have policies that deprived the diabetic detainees of insulin or even didn't let them get checked every hour and maybe even lied about not checking. All those facts may come out to distinguish Cole, but just legally 12B6, a sheriff, individual capacity for understaffing and treatment, that's the case the district court relied on. And you don't cite it? Yes, and Your Honor, Cole doesn't actually put the sheriff on notice because it wasn't, I know that that is the case that they cite, but it doesn't actually address whether the sheriff could be found individually liable. Because like I said, that case was reversed, excuse me. Cole was, the question in Cole was whether, it is whether Cole together with all other fully established law would have told a reasonable sheriff like Sheriff Gonzalez that his specific conduct was unconstitutional, which Cole does not clearly establish. Right, but no one's disputing Belle v. Wolfish. You can't punish a detainee by not giving them insulin. So that's, I don't see that in this case. What I see is you trying to say as a matter of law, a sheriff can't have individual liability and yet we've got precedent, which was the case cited and relied on by the district court with a judge who knows this area of law very well and is not necessarily generous. And so you can't just ignore it. Yes, Your Honor. And I will say that also, the sheriff, although he has this, the awareness, the systemic, the institutional awareness, it would still have to be played where he was acting deliberately indifferent to persons like. Right, but here there's a 135 page complaint alleging, I mean, a host of failure to train only do single dosage insulin, right? And he's responsible for the staffing. So it may be you're right, it doesn't rise to deliberate indifference, but that's still not a 12B6 issue. Yes, Your Honor. Well, disagree with me that I'm wrong. You know, I appreciate the deference, but at some point you've got to say Cole's wrong legally, Cole doesn't apply. And another case that the district court at Annapelle cites is Ford v. Anderson. You don't mention it either. That was just two years ago. Admittedly, that's episodic, but it looks to me like an episodic failure to train sheriff individual liability. These cases seem very significant. Yes, sir. And I can address the Ford case right now also, Your Honor. In the Ford case, which I will agree is probably one of the Appellee's strongest cases in their brief. This case, in this case, this court in Ford, the Fifth Circuit reversed serving judgment in that case for multiple jail defendants, which were the individual jailers, which included the nurses and the doctor in that case for the non-supervisory claims. But Ford's impact on this case is more limited than the Appellee's represent. The Fifth Circuit in this court in Ford affirmed serving judgment in favor of the county and the sheriff on all existing supervisory and missing municipal claims, vacating only to permit claims to amend their complaint to add additional Monel theories. The court did not hold the sheriff individually liable. They were mandated for amendment, which means the sheriff's individual liability cushion under the strength of Monel theory remains unresolved. Right. But it means it's legally available. It just is a remand to see what you're going to allege. Is your position that it's not even legally available? I would say, Your Honor, that Ford goes more towards the official capacity claim than the individual capacity claim, more of a Monel theory than the deliberate indifference that they would have to show for the sheriff in his individual capacity. I guess, counsel, this is obviously a qualified immunity issue. And so, as you know, the proponents of, I mean, the person who's trying to defeat qualified immunity has to point to cases that put someone on clearly established law notice. So they cite a number of cases, Shepard, Montano, Sanchez, Hinojosa. Yes. Are they wrong? I would say, Your Honor, that those cases wouldn't necessarily put the sheriff on notice because those cases went directly to the Monel issue, the sheriff's official capacity, basically. Those are awareness of systemic actions or violations, which would go to the institutional knowledge under a Monel claim. It doesn't show, those cases does not show that the sheriff would have been put on notice that he was violating clearly established law when he took, when he made the decisions that he made as sheriff in his official capacity as a ministry. So the same allegations put him on notice of official capacity violation, but he wouldn't think he's an individual? Well, you would have to, again, the awareness doesn't necessarily translate to deliberate indifference. Right. But denying someone insulin, there's no case that doesn't say, if you know that's happened in 14 pretrial detainees before have died because of it. I'm not aware of a case that specifically says that, Your Honor. So why doesn't this just get to discovery and then we find out, were they lying when they said 96 times we looked in and he didn't seem to be in distress? Was that forgery? Did they destroy the video of the cell? Well that would go towards those individuals. It would, but if the sheriff's on note, I guess I come back to call, this just seems to me stuff that's going to come out favorable or unfavorable to him. Yeah. Well, and I also will say this, Your Honor, that what has been alleged also in the complaint is that the sheriff, you have to show that he was deliberately indifferent to these individuals. He took some actions, which is also in their complaint. He took actions as one, Harris Health, contractor of Harris Health, which is a professional institute, entity, separate entity that has its own doctors, nurses, and all. That isn't a deliberate indifference. And I admit, it seems like he's under huge budgetary constraints, but that all comes out with some discovery. The position you're in here is there can't even be discovery, I thought, because you couldn't hold a municipal officer individually liable. And that's why I keep saying, but didn't our court do that? And the case was followed by this district judge, so how do we reverse it? Well, I would say that there was nothing that put the sheriff, it was nothing clearly established to put the sheriff on notice for individual liability. Even if the court finds that it is, I would say that the actions that the sheriff took was objectionably reasonable. That should still qualify him for qualified immunity. The actions that he took, even with the monitoring of the detainees, he had this system, electric system court track, which was in place to track monitoring, to track observations of inmates. That was an affirmative action that he took. He took an affirmative action, again, contracted with Harris Health. That was an affirmative action to address the health care problems that were systemic and that he had maybe actual knowledge of. And I will argue, Your Honor, that, again, the cases that are mainly cited, the majority of those cases go towards official capacity claims under Monell instead of individual capacity. There still have to be those allegations that the sheriff actually recognized the danger and chose to ignore those dangers and took no action. Here the sheriff did take action. He did take action with a separate medical entity. Now, what happened with that entity, their failures, that would go towards Monell, whether that was adequate or not. That's a Monell claim. Again, for the sheriff, he has to have had tooth upon that knowledge that something could happen, which is not clear in this complaint, that he subjectively knew that this would occur with Mr. Shelton or any other detainee in Mr. Shelton's type of situation. Your Honor, at this time, if you don't have any other questions, I reserve my time. Thank you very much, Kelly. Ms. Neal. May it please the court. Lisa Sneed for Plaintiff's Appellees, Sarah Borch Grevink, Mariana Ruth Thompson. My voice might be going out a little bit, please tell me if you can't hear me, I do apologize. I want to start with sort of the last thing that Mr. Burnett mentioned, the argument that Sheriff Gonzalez's conduct was objectively reasonable, setting aside that that argument was never made in the lower court or here and so should be waived. Plaintiff's complaint also fully addresses that. In order for Sheriff Gonzalez to have been objectively reasonable by having Harris Health come in to take over the medical care, what our complaint clearly shows is that Sheriff Gonzalez knew that there were 41 different practices that denied diabetic detainees insulin and blood glucose monitoring, including the single dose policy, the no more than twice a day policies and practices of not medical staff, not reading messages and lab reports, things of that nature. He knew all of those were in place and did nothing to correct them. Instead, he simply passed them on wholesale to Harris Health. This is not an instance where a new entity came in. This was the existing staff for Harris County that Sheriff Gonzalez had implemented. The training programs had implemented the policies and the practices just became Harris Health staff. These were not new staff. The sheriff's staff became Harris Health staff and continued these policies and practices. And so it's not objectively reasonable to do nothing but simply try to pass the buck onto a different entity when there's already, you know, these policies and practices. So I'm familiar with, obviously with Monel. Yes. And I think of that as, well, there's a policy and that policy is the moving force of the constitutional violation. And so, therefore, the county can possibly be liable under 1983. What additional things do you have to plead to then go, I guess, one step further and say, well, the policymaker here, the sheriff, is individually liable. Not the county, but the sheriff itself. Well, what do you have to allege something additional? Particularly for conditions of confinement. So let's start with that conditions of confinement. So for the conditions of confinement, we also do specifically have to allege, and we have, that Sheriff Gonzalez was subjectively aware that these conditions were dangerous, or here they have killed people, that he drew the inference that they would continue to do so and yet did nothing. OK, so let's zero in on, so conditions of confinement about a policy or about a rule, about something, you know, a condition. What do you allege the sheriff knew about, what policy or rule that he knew about, he knew that it could result in this kind of death from not getting over the right insulin dose, and yet knew about it and did nothing to change it. What specific, because there's so much alleged that I'm having trouble zeroing in on. What exactly are you alleging that he knew about? So on the conditions of confinement case, the district court found, and we allege that there's three overlapping policies and practices. You have the understaffing policy and practice, where the sheriff was not staffing his jail, even sufficient to meet state requirements of minimum. OK, so I'll ask about each one of them, but I want to hear what the three want. Understaffing, which then contributed to, but also there's a standalone condition of non-monitoring, that jailers were not checking on individuals who were in single cells, who were supposed to be being seen at least every 60 minutes, some shorter intervals. I mean, OK, I'll ask about that too. So a policy of non-monitoring, difficult to understand how you'd write out a policy that says don't monitor, right? Yeah, so in this case in particular, I think that policy or practice is highlighted best by the Doe lawsuit. Sheriff Gonzalez was sued by a putative class of his own detention officers, who in that also very long complaint, over 100 pages, I believe, alleged, we're not monitoring detainees. We are supposed to be checking on them every hour, and we're just not. We're walking by their cells. We're falsifying. How's that a policy of the sheriff? It's a practice that created the condition of the jail. Policy is perhaps the wrong word, but it's a practice that was ongoing amongst the detention officers. They weren't checking on detainees. The specific purpose of checking on the detainees in the single cells under the Texas regulations is specifically to be checking them for distress. Generally, these single cell folks are people who have either medical or mental health or some kind of vulnerability, and that's why they're supposed to be checked at those  OK, so monitoring, so staffing, monitoring. And then the last one is the denial of insulin and blood glucose monitoring to diabetics. OK, but again, surely there's not a policy that says deny people insulin because I'm reading allegations about people checking on insulin in two lists, people being low glucose and no insulin. So obviously there's a policy about checking on insulin. Here we have a de facto practice that was created by you have the single dose insulin order, which then made it so that these diabetics weren't getting insulin. And then the blood glucose monitoring order where it was only issued for three days. And so the reference that you were just making when you're saying there's people who were checking, but then it ended after three days. And type one diabetics need blood. OK, so what exactly, though, is the policy that you're saying? The rule, the rule, something that amounts to a condition of confinement. I'm not I'm not saying that something didn't go wrong. Obviously, given the allegations, it looks like a lot of things went wrong. So and this is where it was sort of the variety of overlapping single dose, the only twice a day, the no more than three days. They resulted in a de facto practice of type one diabetics not receiving insulin and blood glucose monitoring. It's the de facto practice that I'm having trouble with because we've got to connect it to the sheriff's knowledge. You're saying he knew about a de facto practice of what? So if I can, the best case, perhaps, that explains the argument I'm making would be Shepard. So Shepard versus Dallas County, that individual had hypertension, needed to have blood pressure medication every single day. OK. And in Dallas County, what the jury ultimately found, because on appeal that was reviewed in the jury verdict, was that the conditions of that jail, they had understaffing, they had practices where medication was not being administered to detainees. And so it created conditions of confinement that were so dangerous that he didn't receive his medication for months, ultimately suffered a stroke and died. And there, the evidence that sort of established the sheriff, it was not an individual liability case, but established. So it's not. See, that's that's a problem. It's not an individual liability case. So what what do we have to do to connect? I assume that's a Monell case. It is a Monell case. OK. So what do we have to do to say that? And believe me, look, I've read the allocations in this case. They're horrific. But I'm saying we're just here on the sheriff's individual liability, not on all the other defendants. And so I'm trying to say, what do you have to go and connect the Monell part of it to the sheriff's knowledge? If Shepard is not an individual liability case, how does that explain? Well, I believe it was Judge Higginson that asked this question before, but I could be wrong, that if a case informs a sheriff that his conduct, the conditions he's imposed or the policies and practices under an episodic acts and omissions case will impose liability on his county, of course it notifies him that it can impose liability on him. An example of this court has done that before in Hinojosa versus Livingston, which is one of the extreme heat cases. The cases that the court relied on to find that those individual prison officials could be liable for conditions of confinement were Gates, which was an injunctive relief case, and Smith v. Sullivan, which was also an injunctive and declaratory relief case. What the court found in Hinojosa, as well as Webb, were that those cases, which concerned injunctive and declaratory relief about exposing prisoners to extreme heat, put the individual prison officials on notice for their own individual liability, that they also could not expose individuals to extreme heat. Palmer v. Johnson is another. So Palmer v. Johnson, in finding that that warden could not expose those prisoners to the conditions that he did outside when he forced them to sleep outside without hygiene and in cold weather, the court relied on Novak v. Beto, which was a case seeking injunctive relief, as well as, I'm going to mispronounce this, D-A-I-G-R-E v. Maggio, which also stated what the clearly established law was, but did then not find a violation. So this court has relied on non-individual liability cases to establish a standard so that that put Sheriff Gonzalez on notice that what he couldn't continue those conditions of confinement, that he could not impose these things. So try to understand this concern. The first thing you raised was understaffing. OK, so if the sheriff is saying, all right, well, you know, I've got to staff adequately. OK, but I have limited resources. I can only staff a certain amount. And something bad happens, as something bad happened in this case. Is there always going to be an allegation against the sheriff individually that says you could have staffed more, you could have staffed better so that this wouldn't have happened? So there's always going to be an allegation that overcomes qualified immunity. It's an individual policymaker based on staffing. So I think there's an important distinction to make. So the staffing cases that Mr. Burnett cited, the sheriff cited, Cope v. Cogdill, in that case, the understaffing allegation that this court said, no, we think that needs to be a Monell municipality. That was not an allegation of understaffing that was insufficient for minimums. That was actually what the plaintiffs in that case wanted, was staffing that would have exceeded what was required. We need more people than the state regulations require. The same in Smith v. Moore, actually. Smith v. Moore was the other case relied upon by Sheriff Gonzalez. In that instance, there was a rape that was committed by a corrections officer. And what the plaintiffs were trying to argue is the jail should never have had only one male officer on duty. You should either always have two men or one woman. But that's another argument that's over minimum staffing. And of course, there, the sheriff had no, there'd been no previous complaints, no other rapes, no reason to know that this one sheriff, or the one jailor, was appropriate. So what about staffing did the sheriff know about here that he failed, was deliberately indifferent with respect to the staffing? What is it about the staffing? So there's several things that put him on notice here. The Doe complaint that I referenced earlier, his officers specifically said the jail is so understaffed that we can't meet the needs of detainees. And we quote some of those in our complaint. The allegations in the lawsuit. Yes. How? Okay. So, so, so they sued Sheriff Gonzales in his official capacity and told him we're not monitoring detainees. I mean, I hear you that it's an allegation, but I do also think that if a detention officer is willing to put in a complaint to a, it is, I hear you. I, I guess I would disagree because as a detention officer, if I'm going to file something in federal court admitting that I'm not meeting basic needs of detainees, that, that to me is more than just an allegation. It is essentially. And the reason I say it's not evidence is because it may turn out to be true or not. The other thing, additionally, there was a Texas Commission on Jail Standards that specifically said you're so understaffed, you're not meeting needs. There were two deaths. So this is about delivery of insulin to somebody who's type one diabetes, who needed particular, I don't, prescription is probably the wrong word, but a particular regime of where's the allegation about the staffing with respect to, you know, people monitoring diabetes, insulin, who's on which list. Then I, then I could see, okay, there's a specific allegation about staffing with respect to diabetes monitoring. I, I don't think we had a specific one on that. The, the two that would come closest, one, two of the deaths that we had that we, we mentioned was Alex Guzman. So he was supposed to be being checked every 30 minutes by detention officers. Those detention officers did not complete those checks. They instead fabricated the records. And of course, Mr. Guzman died. The same with Vincent Young. Vincent Young was one of the actually first deaths after Sheriff Gonzalez took over. Mr. Young was also supposed to be monitored, was not. And that was another instance where the officer fabricated 21 checks. Is there, so I hear what you're saying about fabrication. Are there allegations with respect to Ms., I'm sorry. I know it's not the name of the plaintiff here. Oh, it's Mr. Shelton is the... Shelton. Are there allegations with respect to Mr. Shelton about fabrication of records? Oh, absolutely. Okay. Well, what are those? So 18 different detention officers fabricated checks in this case over the course of about 96 hours. Okay. So there are allegations. All right. There's allegations about fabricated records with respect to Shepard.  And specifically what they were fabricating is saying, we saw him. He was fine. He was breathing. And in fact, by the end of it, he had developed rigor mortis. Okay. Okay. So I'll look at that. Now moving on to the second set of policies that had to do with, remind me again, you said that staffing and then... And then specifically the practice of non-monitoring. Okay. Non-monitoring. As I read your, I've read your allegations. As I read the allegations, there was, the problem was, is he was being given what, you know, one, I've got the, he wasn't being given the proper regime of insulin, right? He was being given this one shot doses and he needed to have something different, right? Yes, at its heart. Yes. Okay. Are there, is that what you mean by non-monitoring? No, the non-monitoring, there's significant overlap with the understaff, the points I was making with understaffing. Non-monitoring specifically is that detention officers are either entirely fabricating, not even coming onto the unit, but claiming to have looked in the window and confirmed face-to-face this detainee's fine, or even if they're on the unit, they're simply walking by. They're not actually checking. And the reason that's so important here is because had anyone actually stopped in and looked at Mr. Shelton, a type one diabetic developing diabetic ketoacidosis is visibly unwell. They will be vomiting. Their face will be flushed. They'll have, there's a distinctive type of breathing that's a rapid... There was a destruction of evidence too, not just the judge. Yes, there was. There's video evidence that of everything except about his last 12 hours was destroyed. As I said, the allegations here are very, very bad, but I'm, I think we're required to connect them up to the sheriff because we're talking about his individual liability. Yes. And so that's, that's where I'm asking you, okay. So not back to non-monitoring. Okay. There needed to be better monitoring to see because somebody in this condition, if you're monitoring in a, in a reasonable way, you see that he's in distress. I get that. Connect that to the sheriff, the sheriff's personal knowledge. Yeah. I knew this. So seven other detainees who had medical vulnerabilities, they were not diabetics, but they had known medical vulnerabilities also died while they were supposed to be being monitored because this monitoring was not happening. You also had three individuals who suffered serious injuries where had this monitoring occurred, that would have been caught. It would have stopped, the injuries wouldn't have happened. Two near misses, which I refer to as that, because two detainees were locked in a van outside of the Harris County jail for 10 hours while staff were claiming to be monitoring them and were instead falsifying the records. It's allegations like that. As bad as that is, that sounds terrible, the locked in the van thing, but what does the locked in the van thing have to do with monitoring, monitoring for diabetes and whether somebody's insulin level is proper? It just seemed like different cases, maybe subject to the different lawsuit. I think so for the extent of the non-monitoring piece, the diabetes is what made Matthew Shelton particularly vulnerable. It's true that if I hopefully would not ever be in a cell in the Harris County jail, I'd probably be fine. I'm not a diabetic. You could probably not monitor me for hours and it would be fine. But there were many people who are medically vulnerable type diabetics in particular, are an example of a vulnerable detainee that Sheriff Gonzalez absolutely knows is going to come into his jail. And so when you already have policies, practices, customs that denied insulin and blood glucose monitoring to a type one diabetic, and then you aren't  As I read your allegations, he was being given insulin. He was being given the wrong, he was in the wrong list. He was on the wrong, if he'd been put on the list where, when he says the allegation, he says, look, I need insulin. He's like, well, you're not on the right list. Well, that looks like a breakdown in the system. Definitely. But I thought that's what went wrong. Is that not what went wrong according to your allegations? So he receives insulin according, there's a single dose order. So he receives it on two or three occasions only on his first day. And then there's no more order. What was, there was a separate order for blood glucose monitoring that lasted a few more days. And so when that blood glucose monitoring, one of those last nurses came and Mr. Shelton tried to explain, Hey, I do need insulin. That nurse was simply told, well, you're, you're not on my list, but that didn't mean that Mr. Shelton didn't need insulin. That doesn't change the fact that there was still this ongoing or this large policy practice about the single dose that had denied him insulin to start with. And actually that incident is one of the additional policies and practices that we allege is a problem is that if nurses are going to come around and monitor for blood glucose and a detainee says, I need insulin, the LVNs weren't doing anything with that information. Well, that did seem to me to be a policy, a possible breakdown in the policy, but connect for me, the Sheriff's personal involvement in a policy about insulin, about this, this thing you're talking about.  So those policies and practices had previously killed 14 diabetics. We allege that 14 diabetics in about the 10 years performance for Shelton died, had specifically died because they did not get insulin and blood glucose monitoring under these same policies. There was also an individual, Mr. Elsweesey, who suffered diabetic ketoacidosis and almost died. Sheriff Gonzalez specifically spoke about that instance publicly when he was on the campaign trail. That's a strange, isn't that odd? I mean, it's, I, you may be absolutely right, but when I read allegations like that, he spoke about it on the campaign trail. Okay. So he's saying there's a problem. He's acknowledging there's a problem. He was, when he was running for office, he acknowledged that the deaths and the medical care at Harris County jail needed to be improved. But then as we allege, he, so he acknowledged this, he comes and he becomes the Sheriff, and then he doesn't actually make any changes for eight years. And so in the other piece though. You allege he doesn't, after running for office based on that problem, or at least in part in that problem, you allege he didn't do anything for eight years. He did not implement changes to the policies or practices about medical care at the jail, and more specifically, the diabetic ones that we identify, he did not. We also allege, you know, and this goes back to the transition to Harris Health, when the decision was made to transition Harris County's employees to becoming Harris Health employees, that was a long 14 month transition. Sheriff Gonzalez presented on a 2018 Health Management Associates report. He also got the updated 2021 Health Management Associates report. Both of those identified that there were serious deficiencies with chronic care at the jail. And then he personally participated in that 14 month transition. I just wanted to, I have three questions about that. Two are legal, one is factual. Do you have a case where a failure to train can be charged as an act of omission claim? That is how, right? That is here. Yes. A failure to train is being charged as an act of omission. Yes. What's a good example? We allege that Sheriff Gonzalez did not train his detention officers to recognize or understand the importance of type 1 diabetes. The cases that we relied on were Burns versus City of Galveston, Texas. That's an act of omission, Kay? It is one, yes. The argument was being made that the jail did not run any training on responding to- Okay, if that's just, I'll just be quick because your time's out, but therefore I want to look at Burns. Is there, this is a fact question. Is there any claim that the sheriff, as to the, against the sheriff, that hasn't been alleged against Harris County? I do believe the Monel claims generally overlap. Of course, we've alleged that he- And that's fine. I'm just wondering- And we have a punitive damages claim against the sheriff that- The last thing is, there was, you heard me ask a lot of questions about the case I'll pronounce, Cole. Yes. C-O-L-L-E. Am I right that that's a conditions of confinement case against a sheriff in his individual capacity? You are right that it is a case against an individual sheriff. I believe that may have actually been an episodic acts. Episodic acts, too. I believe it was episodic acts. It's, the district court relied on it in our, under that section, and I believe that's how we briefed it as well. And I did have a note that I wanted to bring that up. I believe Mr. Burnett made a statement about it being county. There's that section in Cole or Cawley about the sheriff's individual liability denying him qualified immunity is literally titled the sheriff stands alone. So yes, that is an individual claim against the sheriff. Okay. Thank you, counsel. Can I ask a question? Of course. The funding for these jails comes from where? The state or the federal government or both? It's a variety. We also have ADA claims, of course, that are not at issue here. And so we've alleged that they received some federal funding for those. And then of course, there's some county funding. Harris County Sheriff's Office budget, I believe, is over a billion dollars. So I think it's a little bit of everything. But we get, excuse me, a large number of cases of people dying in jails all over the state. It may not be unique to Texas, but it certainly is a very serious problem. I've had several of them myself. And it's a systemic problem. It's more than just the particular jail. It's the way the system compensates the jail for the manpower needs that they have. And who is it that provides that money? Undoubtedly, part of it is the state. I believe, yes, there are different programs that are funded in different pieces. So I do think they get state funding. I do think they get federal funding. I certainly agree that funding is a concern. I do think at this stage, I would say, we've not alleged that what happened here was the result of budgetary constraints. As I mentioned, the Harris County Sheriff's Office has an over a billion dollar budget. And the Sheriff has some discretion on how he wants to use that. So we've certainly not made any allegations that the budget is a reason for any of the violations that happened here. If I remember, your brief cites cases to the opposite, that budget doesn't excuse. Exactly, yes. That is in a footnote on our briefing. We cited DeLauder, Gates v. Collier, Wyatt v. Aderholt, that money is not a reason to violate the constitutional rights of detainees. Thank you, Counsel. Thank you. Thank you. Now, as I just want to wrap up by closing remarks with, even if this court finds a clearly established right and adequate individual deliberate indifference, the Pelley's must show that the Sheriff's policies were the moving force behind Mr. Shelton's death. The Pelley's own complaint describes a chain of individual failures by 18 separate jailers and multiple medical providers, each making independent choices to falsify records, ignoring Mr. Shelton's symptoms and failed to summon help. These intervening individual acts by a non-policymaker employee breaks the causal chain between the Sheriff's policies and Mr. Shelton's death in a way that the complaint does not adequately address. At the motion to dismiss stage, the operative pleadings must contain sufficient factual allegations to permit a reasonable inference that the individual defendant is personally liable. Generalize allegations about systemic conditions. However voluminous, do not satisfy that standard against an official, an individual official. For these four core reasons, this court should reverse the district court's denial of qualified immunity and render judgment in favor of Sheriff Ed Gonzalez. Three independent grounds each compel that result. First, the Pelley's individual capacity theory is a Monell theory in disguise. Every allegation against Gonzalez is premised on his role as the county's final policymaker, not on any personal individual act of misconduct. Second, Gonzalez's affirmative measures contracting with Harris Health and implementing poor track foreclose the inference of personal deliberate indifference. A defendant who takes affirmative steps to address detaining welfare has not consciously disregarded a known risk. Third, I would say that no clearly established law put Gonzalez on notice that his specific administrative decisions would expose him to section 1983 damages liability. And for these reasons, I would, if the court does not have any other further questions for me, I would ask that this court reverse. Thank you. Thank you, counsel. Thank you. The case is submitted. Should we continue? Sure.